**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TANYA FURRY,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| | : | **NO. 10-2848** |
| | : | |
| **LEHIGH VALLEY** | : | |
| **HEALTH SYSTEM, et al.,** | : | |
| **Defendants** | : | |

**M E M O R A N D U M**

**STENGEL, J.**                                    **September 28, 2012**

In this employment discrimination case, Plaintiff Tanya Furry alleges that

Defendants Lehigh Valley Health System t/a Lehigh Valley Hospital ("LVH") and Gerry

Kresge violated her disability and leave rights under the Americans with Disabilities Act,

42 U.S.C. § 12101 *et seq.* ("ADA") ("Count I"), the Family and Medical Leave Act, 29

U.S.C. § 2601 *et seq.* ("FMLA") ("Count II"), and the Pennsylvania Human Relations

Act, 43 P.S. § 951 *et seq.* ("PHRA") ("Count III").

The parties filed cross motions for summary judgment.  Defendants seek summary

judgment on Count I's termination-based ADA claim, arguing it is both time barred and

deficient for lack of a disability.[1]  Plaintiff seeks partial summary judgment on Counts I

and II.  Regarding Count I, Plaintiff contends she has presented direct evidence of

discrimination under the ADA.  Regarding Count II, Plaintiff contends LVH denied her

reinstatement under the FMLA.  For the following reasons, I will grant Defendants'

---

[1] Defendants also sought summary judgment on Count II's FMLA claim, arguing it was time barred, but they
withdrew this argument in their Reply.  (Doc. No. 50 at 2.)

motion as to Counts I and III, grant in part and deny in part Defendants' motion as to Count II,[2] and deny Plaintiff's motion.

## I.     BACKGROUND

Gerry Kresge, LVH's director of security, interviewed and hired Tanya Furry as a security officer in March 2005.  (Doc. No. 44[3], ¶ 1.)  Throughout her employment at LVH, Furry reported to Kresge.  (Id. at ¶ 2.)

### A.     FMLA Leave Procedure at LVH

Jeri Lemanek was employed by LVH Health Network as the disability case manager in 2008.   (Doc. No. 42[4] at ¶ 2.)  Lamenek was responsible for considering the medical necessity of a person's need for leave and request for disability benefits.  (Id. at ¶ 3.)  The different types of medical leave that an LVH employee may qualify for are FMLA leave, non-FMLA medical leave, personal leave, intermittent family medical leave, and military leave.  (Id. at ¶ 5.)

To pursue FMLA leave, an employee must obtain and complete an FMLA request packet, which includes an instruction sheet, an employee request, and a physician's certification.  (Id. at ¶ 11.)  Once the completed packet is provided to LVH's Employee Health department, Lemanek determines whether the employee's request is medically supported.  (Id. at ¶ 7.)  In-patient hospitalization automatically qualifies an employee for FMLA leave.  (Id. at ¶ 10.)

---

[2] Plaintiff also filed suit against Cheryl Brunovsky and Jeanne Hoover on Count II; however, Plaintiff now agrees to the dismissal of both defendants.  (Doc. No. 47 at 3 n.1.)  Accordingly, I will grant summary judgment in favor of Defendants Brunovsky and Hoover as to Count II and dismiss them as parties to this action.
[3] Defendants' Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment.
[4] Plaintiff's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment.

An employee returning from FMLA leave may be required to undergo a fitness-for-duty examination.  (Id. at ¶¶ 18, 20.)  The decision to require a fitness-for-duty examination may be made by Lemanek, Director of Employee Health Carol Guanosky, an Employee Health nurse, or a disability counselor.  (Id. at ¶ 21.)  The criteria for making that decision relates to the reason the person is out of work.  (Id. at ¶ 22.)  An employee who has been out of work for an orthopedic condition, recent surgery, or mental health issue must undergo a fitness-for-duty evaluation in Employee Health, in addition to providing a release by the employee's personal physician.  (Id.)  Employee Health does not necessarily review an employee's personal physician's release prior to referring the employee for a fitness-for-duty examination.  (Id. at 24.)

Employee Health physicians, whom LVH contracts through Health Works, conduct fitness-for-duty examinations in the Employee Health office.  (Id. at ¶ 27.)  The fitness-for-duty practitioner determines whether someone is able to resume the essential functions of their job upon returning to work.  (Id. at ¶ 36.)  The fitness-for-duty practitioner is empowered to order an employee not to return to work regardless of what the personal physician's release said.  (Id. at ¶ 35.)

### B.    Furry's First FMLA Leave

LVH granted Furry FMLA medical leave for depression and anxiety from August 30, 2006, through December 11, 2006.  (Doc. No. 44 at ¶ 5.)  In January 2007, upon Furry's return from her first FMLA leave, LVH assigned Furry, at Kresge's request, to a receptionist position.  (Id. at ¶ 6.)  Furry was satisfied with her receptionist position and suffered no adverse consequences from taking FMLA leave in 2006.  (Id. at ¶¶ 7-8.)

### C.   Furry's Second FMLA Leave

In October 2007, Furry requested and received her second FMLA medical leave. (Id. at ¶ 9.)  Cheryl Brunovsky, an LVH disability counselor, approved Furry's request by letter dated October 26, 2007.  (Id. at ¶ 10.)  Furry was out on her second FMLA medical leave from October 10, 2007, to November 15, 2007.  (Id. at ¶ 11.)  Furry's clinical psychologist, Dr. Janice E. Cunningham, released Furry to return to work without restrictions beginning November 14, 2007.  (Id. at ¶ 12.)

### D.   Approved Medical and Grief Leave

On March 18, 2008, Furry suffered a miscarriage.  (Id. at ¶ 13.)  That same day, Furry gave her supervisor, John Hess, a doctor's note stating that "suction dilation and curettage" surgery was scheduled for later that afternoon and that Furry would be absent for medical reasons until March 26, 2008.  (Id. at ¶ 14.)  LVH granted this medical leave request, and Furry never requested or sought FMLA leave for her miscarriage or surgery. (Id. at ¶¶ 15-16.)  On March 21, 2008, Furry's uncle, who was also an LVH employee, died.  (Id. at ¶ 17.)  Kresge gave Furry three days off so she could grieve and attend her uncle's funeral.  (Id. at ¶ 18.)  Furry's attendance record indicates that she was absent on March 16, 17, 19, 20, and 21.  Furry returned to her "normal schedule" on March 24, 2008, which was her last day of work at LVH.  (Id. at ¶ 19.)  Ms. Furry's attendance record indicates that she did not work thereafter, but does indicate why.  (Doc. No. 42 at ¶ 41.)

E.      **The Return to Work Clearances**

On or about April 7, 2008, Furry telephoned Kresge to ask for the next day off to visit her Ob/Gyn.  (Doc. No. 44 at ¶ 20.)  Kresge told Furry that, because of her miscarriage, she was too emotional to return to work and that she should speak with someone in Employee Health.  (Id. at ¶ 21.)  Kresge told Furry not to come to work the next day (the day of her Ob/Gyn appointment), but Kresge did not tell Furry how long she should be off work.  (Id. at ¶ 22.)  When the April 7 telephone conversation between Kresge and Furry occurred, Furry had not been to work at LVH for two weeks.[5]  (Id. at ¶ 23.)

Furry visited her Ob/Gyn on April 8, underwent an exam, and was told everything was fine.  (Id. at ¶ 25.)  According to Lemanek, Furry was scheduled to undergo a fitness-for-duty evaluation at Employee Health on April 9, which Furry did not attend.[6]  (Doc. No. 42 at ¶ 42.)  On April 10, Furry claims that Jeanne Hoover, an LVH human resources consultant, told Furry she needed to submit three return-to-work notes to Employee Health before she could return to LVH.  (Doc. No. 44 at ¶ 26.)  The notes were to be provided by her family physician, Ob/Gyn, and mental health provider.  (Id.)   Hoover denies ever requiring Furry to submit a return-to-work note.  (Doc. 48, Ex. 1. at ¶¶ 3-4.)

Furry's Ob/Gyn released Furry to return to work without restriction on April 8. (Doc. No. 44 at ¶ 27.)  On April 11, Dr. Farbowitz, Furry's family physician, also released Furry to return to work without restriction.  (Id. at ¶ 28.)  However, Dr.

---

[5] In her deposition, Furry could not explain this absence.  (Furry Dep. at 70-71, 102-04.)
[6] Furry claims she never scheduled the April 9 fitness-for-duty appointment, and the record does not reveal who did. (Furry Dep. at 75.)  Regardless, it appears Furry was aware of the appointment and simply forgot about it.  (Id.)

Cunningham, Furry's mental health provider, refused to provide Furry with a return-to-work note.[7]  (Id. at ¶ 29.)

### F.    The May 2, 2008, Employee Health Visit

On May 2, 2008, Furry visited Employee Health to provide the return-to-work notes from her Ob/Gyn and family physician and "to tell them what was going on."  (Id. at ¶ 30.)  Furry admits to feeling and appearing very upset during her meeting with the Employee Health physician because of her miscarriage, her uncle's death, and from being out of work.  (Id. at ¶ 32.)  Given Furry's emotional state, the Employee Health physician told Furry she would not be permitted to return to work without a note from Dr. Cunningham.  (Id. at ¶ 34.)  On May 5, 2008, Cheryl Brunovsky wrote to Furry conditionally approving a medical leave of absence retroactive to April 14, 2008.  (Id. at ¶ 36.)  Enclosed with this FMLA conditional approval letter was an FMLA medical certification form that Furry needed Dr. Cunningham to complete within 15 days.  (Id.)  Dr. Cunningham never completed, and Furry never provided, the FMLA medical leave certification form.  (Id. at ¶ 37.)

---

[7] Confusion abounds over why Cunningham refused to provide Furry with a return-to-work note.  Furry claims she spoke with Cunningham personally over the phone "at least a dozen times" about obtaining a release and even stopped by Cunningham's office on two occasions.  (Furry Dep. at 110.)  According to Furry, Cunningham said she could not provide Furry with a return-to-work note because "legally . . . she never signed [Furry] out to begin with." (Id.)  Cunningham, on the other hand, claims Furry wanted her "to sign a paper going against [Furry's primary care physician] and gynecologist saying that [Furry] was not ready to go back to work."  (Cunningham Dep. at 100.) According to Cunningham, the only note Furry ever requested was a note keeping Furry *out* of work.  (Id.) Cunningham told Furry that she couldn't provide Furry with such a note "because Furry was out of work for a miscarriage" and Cunningham was a psychologist who "did not have the expertise to say . . . [Furry] wasn't healthy enough or recovered from the D&E and the pregnancy to go back to work."  (Id.)  In fact, it was Cunningham's opinion that getting back to work "would be the most helpful thing" for Furry.  (Id. at 102.)  In any event, Cunningham never provided Furry with a return-to-note work.

### G.     The Termination Letter

On June 6, Jeanne Hoover wrote to Furry stating that LVH still had not received "medical documentation" to support Furry's "continued absence."  (Doc. No. 44, Ex. C.)  Based on this letter, Furry understood that if she failed to provide either a return-to-work note or the FMLA leave documents to Employee Health by June 13, 2008, LVH would terminate her employment.  (Id. at ¶ 40.)  On June 12, Furry telephoned Jeri Lemanek and complained that Dr. Cunningham refused to provide either a return-to-work note or FMLA leave certification.  (Id. at ¶ 41.)  Lemanek extended the deadline to June 18, by which time Furry was required to (1) supply Employee Health with a return to work clearance from Dr. Cunningham, (2) supply Employee Health with FMLA leave certification from Dr. Cunningham, or (3) have Dr. Cunningham contact the Employee Health Physician directly to discuss Furry's status.  (Id. at ¶ 42.)

Furry never provided to Employee Health either a return-to-work note or FMLA leave certification from Dr. Cunningham.  (Id. at ¶ 45.)  On June 20, Hoover wrote to Furry terminating Furry's employment since she was "unable to provide [LVH] with the appropriate documentation to support [her] continued absence from work."  (Doc. No. 42, App. 1, Ex. 15.)

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   For an

issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

A party moving for summary judgment always bears the initial burden of informing the Court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing relevant portions of the record, including depositions, documents, affidavits, or declarations, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c). Summary judgment is therefore appropriate when the non-moving party fails to rebut the moving party's argument that there is no genuine issue of fact by pointing to evidence that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322; Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992).

Under Rule 56 of the Federal Rules of Civil Procedure, the Court must draw "all justifiable inferences" in favor of the non-moving party. Anderson, 477 U.S. at 255. The Court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id. at 252. The nonmoving party cannot avert summary judgment with speculation or conclusory allegations, such as those found in the pleadings, but rather, must present clear evidence from which a jury can reasonably find in its favor.

Ridgewood Bd. of Educ. v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir. 1999).   Finally, in reviewing a motion for summary judgment, the Court does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion.   Siegel Transfer v. Carrier Express, 54 F.3d 1125, 1127 (3d. Cir. 1995).

## III.   DISCUSSION

### A.   ADA and PHRA Claims (Counts I and III)[8]

Furry alleges LVH terminated her in violation of the ADA.  LVH moves for summary judgment on two grounds.  First, LVH argues that Furry's claim is time barred.  Second, LVH argues that Furry is not disabled within the meaning of the ADA.  Furry also moves for summary judgment, contending she has presented direct evidence of discrimination.

### 1.   Timeliness of Plaintiff's Charge

In a deferral state, the ADA provides that a plaintiff must file a charge with the EEOC within 300 days "after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1).  Pennsylvania is a deferral state.  Watson v. Eastman Kodak Co., 235 F.3d 851, 854 (3d Cir. 2000).  Thus, Furry was required to file her charge with the EEOC within 300 days of the adverse employment action.

The parties dispute when exactly the adverse employment action occurred and consequently when the statute of limitations on Furry's ADA claim began running.  LVH argues that Furry's ADA claim accrued when she received a notice of termination, not

---

[8] Because courts "generally interpret the PHRA in accord with its federal counterparts," my disposition of Furry's ADA claim applies equally to her PHRA claim.  Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir.1996).

when her employment actually ceased.  (Doc. No. 44 at 10.)  According to LVH, this occurred on June 12, 2008, when Furry received Hoover's June 6 letter.  Because Furry waited until April 9, 2009, to file her EEOC charge—301 days after she received Hoover's letter—LVH reasons that her ADA claim is time barred.  Furry counters that the statute of limitations on her ADA claim only began running when her termination became inevitable.  (Doc. No. 47 at 9.)  Under this standard, Furry's ADA claim accrued at the earliest on June 18, 2009, the date by which Plaintiff was required to supply Employee Health with either a return-to-work note or an FMLA leave certification from Dr. Cunningham, thereby bringing her filing within the 300-day deadline.  Both parties rely on Delaware State College v. Ricks, 449 U.S. 250 (1980), for their respective propositions.

In Ricks, plaintiff Ricks, a professor at Delaware State College, was denied tenure and offered a one-year "terminal" contract, which he accepted.  449 U.S. at 253.  Ricks subsequently filed an EEOC charge of questionable timeliness, and the critical issue became when his cause of action accrued.  Ricks contended that his claim accrued on the final date of his terminal contract.  The Court rejected this argument.  Focusing on the precise date of the unlawful employment action, rather than the final date of employment, the Court observed that "termination of employment at Delaware State is a delayed, but inevitable, consequence of the denial of tenure."  Id. at 258.  Accordingly, "the limitations periods commenced to run when the tenure decision was made and Ricks was notified."  Id. at 259.

The Third Circuit discussed <u>Ricks</u> in <u>Watson</u>, 235 F.3d 851.  There, Kodak terminated plaintiff Watson's employment as an account executive, although it left open the possibility that he could continue with the company if he found a different position within a month.  Watson failed to find another position, was terminated, and filed an EEOC charge.  The court, applying <u>Ricks</u>, held that Watson's claim accrued when he received notice of his termination from the account executive position, despite "the possibility of continued employment in another position."  235 F.3d at 855.  "As a matter of law, notice of an 'operative decision' of termination is not equivocal merely because it was 'given . . . in advance of a designated date on which employment terminated.'"  <u>Id.</u> at 856 (quoting <u>Chardon v. Fernandez</u>, 454 U.S. 6, 8 (1981)).

In the present case, Furry's termination of employment with LVH was not a "delayed but inevitable result" of Hoover's June 6 letter.  <u>See id.</u> at 852-53 ("[A]n adverse employment action occurs, and the statute of limitations therefore begins to run, at the time the employee receives notice of that action *and* termination is a delayed but inevitable result.") (emphasis added).  The letter informed Furry that "[i]f Employee Health does not receive updated documentation from your physician by next Friday, June 13, 2008, then we can no longer support your absence and your employment with [LVH] will be terminated *as of that date*."  (Doc. No. 44, Ex. C.) Lemanek later extended this deadline to June 18.

LVH's contention that Hoover's letter rendered Furry's termination "certain" and her continued employment with LVH "speculative" is simply not accurate.  (Doc. No. 44 at 13.)  Although Furry reasonably "understood" Hoover's letter to be a "termination"

11

letter, the letter did not, in fact, terminate Furry's employment or render her termination inevitable.  The speculative possibility of continued employment in <u>Watson</u> followed the plaintiff's conclusive termination from the account executive position.  235 F.3d at 857 ("The letter stated that 'as of January 1, 1997 you are no longer in the Account Executive position.'").  Likewise, in <u>Ricks</u>, the Court made clear that it considered the plaintiff's denial of tenure and his termination to be one and the same.  449 U.S. at 258.  In contrast, Hoover's June 6 letter rendered Furry's termination anything but inevitable.  The letter clearly indicated that Furry had until June 13 (later extended to June 18) to supply the necessary documentation related to her absence.  If she supplied the documentation, she could continue working at LVH; if she did not, she would be terminated.

Accordingly, the date of the "alleged unlawful employment practice" was, at the earliest, June 18, 2008, the date by which Furry was required to produce medical documentation or be terminated.  Her filing with the EEOC on April 9, 2009, occurred 295 days later, within the 300-day statute of limitations required by the ADA. Furry's charge was therefore timely filed.

## 2.    Proving Discrimination Under the ADA[9]

The ADA prohibits discrimination "against a qualified individual with a disability."  42 U.S.C. § 12112(a).

A plaintiff may advance an ADA disparate treatment claim by presenting direct or circumstantial evidence of discrimination.  Where a plaintiff produces only circumstantial

---

[9] The ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat. 3553, took effect on January 1, 2009.  Because "the ADAAA cannot be applied retroactively," I will apply the statute and regulations as they existed during the events in question.  <u>Britting v. Sec'y, Dept. of Veterans Affairs</u>, 409 F. App'x 566, 569 (3d Cir. 2011).

evidence, courts apply the three-step burden-shifting framework detailed in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>See</u> <u>Shaner v. Synthes</u>, 204 F.3d 494, 500 (3d Cir. 2000).   In the first step, a plaintiff must establish a prima facie case of discrimination.[10]  <u>Id.</u>  If the plaintiff does so, the burden shifts to the defendant employer to articulate a legitimate, non-discriminatory reason for the challenged action.  <u>Id.</u>  If the defendant makes this showing, the burden shifts back to the plaintiff, who must produce "some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  <u>Fuentes v. Perskie</u>, 32 F.3d 759, 764 (3d Cir. 1994).  In contrast, where a plaintiff produces direct evidence, the <u>McDonnell Douglas</u> framework does not apply.  <u>See</u> <u>Keys v. City of Philadelphia</u>, CIV.A. 04-0766, 2005 WL 3234847 (E.D. Pa. Nov. 29, 2005).  To qualify as direct evidence, "the evidence must be such that it demonstrates that the 'decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.'"  <u>Walden v. Georgia-Pac. Corp.</u>, 126 F.3d 506, 513 (3d Cir. 1997) (quoting <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 277 (1989)) (O'Connor, J., concurring).

Regardless of a plaintiff's method of proof, direct or circumstantial, a "threshold requirement in a disability discrimination case under the ADA is that the plaintiff be a

---

[10] To establish a prima facie case of discrimination under the ADA, a plaintiff must show "'(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination.'"  <u>Taylor v. Phoenixville Sch. Dist.</u>, 184 F.3d 296, 306 (3d Cir. 1999) (quoting <u>Gaul v. Lucent Technologies</u>, 134 F.3d 576, 580 (3d Cir.1998)).

'qualified individual with a disability.'"  <u>Krensavage v. Bayer Corp.</u>, 314 F. App'x 421, 425 (3d Cir. 2008).  The ADA defines a "qualified individual with a disability" as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  The ADA further defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).

Furry does not contend she is actually disabled under § 12102(2)(A); rather, she alleges she has a "record of" and was "regarded as" having a disability under § 12102(2)(B) and (C).  LVH contends Furry is not disabled under either section.  I agree with LVH.  Because I find that Furry is not "disabled" within the meaning of the ADA, I will grant LVH's motion as to Counts I and III and deny Furry's as to the same.

### 1.    "Record of" Disability

A person has a "record of" disability under the ADA if that person "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities."  29 C.F.R. § 1630.2(k).  "'A plaintiff attempting to prove the existence of a record of disability still must demonstrate that the recorded impairment is a disability within the meaning of the ADA.'  Thus, like proof of a disability itself, a record of disability demands evidence of a substantial limitation in the

performance of a major life activity."[11]  Merit v. Se. Pennsylvania Transit Auth., 315 F. Supp. 2d 689, 701 (E.D. Pa. 2004) (quoting Tice v. Ctr. Area Transp. Auth., 247 F.3d 506, 513 (3d Cir. 2001)).  Furry suffers from depression, a mental impairment under the ADA.  See Bennett v. Unisys Corp., 2:99CV0446, 2000 WL 33126583, at *4 (E.D. Pa. Dec. 11, 2000).  The only issue is whether her depression substantially limited a major life activity.

Furry identifies only one major life activity that she contends her depression substantially limited: thinking.  (Doc. No. 47 at 15.)  As support, she points solely to her "repeated absences from work" and "periods of leave."[12]  (Id. at 16.)  Furry otherwise cites no record evidence and only one case in support, Taylor v. Phoenixville Sch. Dist., 184 F.3d 296 (3d Cir. 1999).

In Taylor, the Third Circuit first identified thinking as a major life activity.  There, plaintiff Taylor suffered from severe bipolar disorder, which, even when treated, left her prone to "paranoia[,] . . . impaired concentration[,] and memory problems."  Id. at 308-09.  Based on these symptoms, the court held that a reasonable jury could conclude Taylor's ability to think was substantially impaired.  Other courts in this Circuit that have sent the ability-to-think issue to the jury faced plaintiffs with equally serious symptoms.

---

[11] According to the EEOC, a person is "substantially limited" if the person is "(i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."  29 C.F.R. § 1630.2(j)(1).  In making this determination, courts should consider "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."  29 C.F.R. § 1630.2(j)(2); see also Taylor, 184 F.3d at 307 (applying the factors in 29 C.F.R. § 1630.2(j)).

[12] Although Furry does not so indicate, she is presumably referring to her two periods of FMLA leave in 2006 and 2007.

In <u>Cambria v. Ass'n of Flight Attendants, AFL-CIO</u>, CIV.A.03-CV-5605, 2005 WL 1563343 (E.D. Pa. June 30, 2005), for instance, the plaintiff "testified that she has suffered suicidal thoughts, eaten pesticide, and attempted suicide as a result of her mental impairment.  Plaintiff also testified that she was like a 'zombie' and 'could not function' at times."  <u>Id.</u> at *11.  Furthermore, in <u>Bennett</u>, 2000 WL 33126583, the plaintiff "testified that when she returned from disability leave, her thoughts were distorted and that she had difficulty concentrating.  She misunderstood assignments and in one instance produced a document that generally did not make any sense."  <u>Id.</u> at *7; <u>see also</u> <u>Nawrot v. CPC Int'l</u>, 277 F.3d 896, 905 (7th Cir. 2002).

Here, Furry alleges no such symptoms.  Neither Furry nor her clinical psychologist, Dr. Janice Cunningham, testified that Furry's depression limited—much less *substantially* limited—her ability to think.  The most the record reveals is that, when asked how her depression affected her, Furry stated it left her "moody," with "low self-esteem," and with a desire "to be by [her]self."  (Furry Dep. 163.)  Although Furry "does not have to show an utter inability to think in order to survive a summary judgment motion," <u>Bennett</u>, 2000 WL 33126583, at *7, the symptoms described by Furry do not alone substantially limit one's ability to think compared to an average person in the general population.  Moreover, that Furry at one time took approved FMLA leave for a serious health condition does not satisfy her burden of demonstrating a disability under the ADA.  <u>See</u> <u>Ellis v. Mohenis Services, Inc.</u>, CIV. A. 96-6307, 1998 WL 564478, at *5 (E.D. Pa. Aug. 24, 1998).

Based on this evidence, no reasonable jury could conclude that she was substantially limited in performing the major life activity of thinking and, consequently, that she is disabled under § 12102(2)(B).

### 2.    "Regarded as" Having a Disability

To prevail under the ADA's "regarded as" prong, a plaintiff must demonstrate either that (1) despite having no impairment at all, the employer erroneously believes that the plaintiff has an impairment that substantially limits major life activities; or (2) the plaintiff has a non-limiting impairment that the employer mistakenly believes limits major life activities.  Tice v. Ctr. Area Transp. Auth., 247 F.3d 506, 514 (3d Cir. 2001) (citing Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999)).  An employee must do more than show he was regarded as "somehow disabled."  Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 381 (3d Cir. 2002).  Rather, the relevant inquiry is whether the employer perceived the employee as disabled within the meaning of the ADA.[13] Eshelman v. Agere Sys., Inc., 554 F.3d 426, 434 (3d Cir. 2009).

In support of her motion for summary judgment, Furry points primarily to a May 23, 2008, email exchange between Kresge and Lemanek:

LEMANEK:  Tanya Furry has tentatively scheduled a RTW visit for Tues.

5/27/08 at 2:00pm.  I'd tell you to smile, but your face might break.

---

[13] Furry has not identified in her briefings which major life activity LVH perceived as being substantially limited by her depression.  I will therefore assume, as with her argument under § 12102(2)(B), that Furry alleges LVH regarded her as being substantially limited in her ability to think.  See Ramage v. Rescot Sys. Group, Inc., 834 F. Supp. 2d 309, 323 (E.D. Pa. 2011).

17

KRESGE:      My guess is the mrs.softee [*sic*] group will let her extend the FMLA

or maybe we will find out she is really insane.  Do you want me

there for the interview?

LEMANEK: [T]o diagnose insanity would mean to find that there is a brain—

what are the chances?

(Doc. No. 42, App. Vol. 1, Ex. 11.)  Furry contends Lemanek's "brain" comment is

evidence that Lemanek regarded Furry as "substantially mentally impaired."  (Doc. No.

43 at 22.)  Kresge also allegedly told Furry that she "cr[ied] too much" and was "too

emotional," "unstable," a "basket case," and a "looney bin."  (Furry Dep. at 44-47).

Finally, Furry points to Kresge's April 7, 2008, instruction that she visit Employee Health

before returning to LVH because she was "too emotional to be at work."[14]  (Doc. No. 51

at 4; Furry Dep. at 73.)

LVH contends in its motion for summary judgment that the comments by

Lemanek and Kresge suggest only that they viewed Furry as unintelligent and overly

emotional, not that she was disabled within the meaning of the ADA.  (Doc. No. 48 at

12.)  LVH further contends that Kresge's April 7 request that Furry visit Employee

Health was proper under the ADA and does not indicate that LVH regarded Furry as

disabled.  (Doc. No. 44 at 17-18.)

Lemanek's "brain" comment does not raise a genuine factual dispute over whether

she perceived Furry as limited in her ability to think.  First, although Furry now alleges in

her briefing that Lemanek regarded her as mentally impaired, Furry testified that Kresge

---

[14] Furry has not alleged she was subjected to an improper medical examination under 42 U.S.C. § 12112(d)(4).

18

was the only person at LVH whom she believed regarded her as mentally impaired.

(Furry Dep. at 245.)  Furthermore, while Furry urges that Lemanek's email indicates

Lemanek literally believed Furry "did not have a brain" (Doc. No. 43 at 22), the

comment, at most, reflects Furry's perceived intelligence, not her ability to think.

Although at the time of the email Lemanek was apparently aware that Furry was

suffering from a mental health condition (Lemanek Dep. at 95), Furry has not alleged that

Lemanek's email comment was made in reference to her depression or any other

perceived impairment.  Without additional evidence indicating that Lemanek treated

Furry as though she was disabled, Lemanek's mere "name-calling" does not alone raise a

genuine issue of material fact on the matter.[15]  See Costello v. Mitchell Pub. Sch. Dist.

79, 266 F.3d 916, 919 (8th Cir. 2001).

As for Kresge's comments, while he obviously considered Furry to be overly

emotional, "[e]motional volatility or imbalance is . . . not a 'substantially limiting' mental

impairment under the ADA."  Mickens v. Polk County Sch. Bd., 430 F. Supp. 2d 1265,

1274 (M.D. Fla. 2006).  Moreover, Kresge's remarks about Furry's emotional state do

not suggest he perceived her thinking ability to be limited.  In fact, Furry's testimony

reveals the opposite:

---

[15] For much the same reason, Furry's claim that the May 23 email constitutes direct evidence of discrimination also fails. (Doc. No. 43 at 20-23.)  Direct evidence is evidence that is "'so revealing of discriminatory animus that it is not necessary to rely on any presumption from the prima facie case to shift the burden of production.'"  Buchsbaum v. Univ. Physicians Plan, 55 F. App'x 40, 45 (3d Cir. 2002) (quoting Armbruster v. Unisys Corp., 32 F.3d 768, 778 (3d Cir.1994)).  As indicated, Lemanek's "brain" comment simply does not reveal any discriminatory animus.  The comment makes no reference to Furry's depression or Lemanek's perception of the same, nor is it causally connected to Furry's termination.  See Merrill v. Burke E. Porter Mach. Co., 159 F. App'x 676, 679 (6th Cir. 2005) (evidence that supervisor called employee "stupid" without "any reference to disability" was not direct evidence of discrimination).  As to Kresge's "insane" comment, even assuming it is revealing of discriminatory animus, Furry conceded in her deposition that she has no evidence suggesting Kresge made the decision to terminate her or was involved in it. (Furry Dep. at 183.)  The email is not direct evidence of discrimination.

19

Q.      Are you contending that Gerry Kresge believed that because of your mental

        impairment you could not do your job?

A.      No.

Q.      Did he ever say that to you?

A.      No.

Q.      In fact, he told you on more than one occasion that he thought you did a

        good job?

A.      Yes.

Q.      And he gave you good performance reviews, correct?

A.      That I know of.

Q.      And he thought that you should have passed the security test so that you

        could have stayed as a security officer, correct?

A.      Yes.

(Furry Dep. at 246.)   Given Kresge's admitted confidence in Furry's ability to perform

her job, no reasonable jury could conclude that he perceived Furry as substantially

limited in her ability to think.

    Nor does Kresge's request that Furry visit Employee Health suggest that he

regarded her as disabled.  Under the ADA, "[a] covered entity may require a medical

examination (and/or inquiry) of an employee that is job-related and consistent with

business necessity."  29 C.F.R. § 1630.14(c). "[A] request for an [independent medical

examination] that complies with the statutory restrictions [in § 1630.14(c)] will never, in

the absence of other evidence, be sufficient to demonstrate that an employer 'regarded'

the employee as substantially limited in a major life activity." Tice v. Ctr. Area Transp.
Auth., 247 F.3d 506, 515 (3d Cir. 2001); see also Parker v. Port Auth. of Allegheny
County, 90 F. App'x 600, 604 (3d Cir. 2004) ("Requiring an employee to 'submit a
medical release and be cleared by [her] physician' is not evidence that an employer
regards the employee as disabled.") (quoting Somers v. City of Minneapolis, 245 F.3d
782, 788 (8th Cir. 2001)).  Lower courts in this Circuit have further held that "curbing
excessive absenteeism[] and ensuring that employees are emotionally . . . fit to perform
their duties illustrate the types of justifications that qualify as business necessities."
Pennsylvania State Troopers Ass'n v. Miller, 621 F. Supp. 2d 246, 252 (M.D. Pa. 2008);
see also Behanna v. Monongahela Valley Hosp., CIV.A. 09-0241, 2010 WL 4340961, *7
(W.D. Pa. Oct. 22, 2010); Scott v. Allied Waste Services of Bucks-Mont, CIV.A. 10-105,
2010 WL 5257643, *5 (E.D. Pa. Dec. 23, 2010).

The record reveals that Kresge had a reasonable basis for directing Furry to
Employee Health and that the Employee Health physician was justified in requiring Furry
to obtain a return-to-work note from Dr. Cunningham.  As of the April 7 phone call,
Furry had been absent from work for two weeks, without explanation, after returning
from leave for one day following her miscarriage and her uncle's death.  Furry admits she
was emotional on the call.  (Furry Dep. at 187.)  Furry further admits that she was tearful
and upset during her visit with the Employee Health visit on May 2.  (Furry Dep at 98-
99.)  Given the recent traumatic events in Furry's life, her inexplicable absenteeism, and
her emotional state, Kresge's request that Furry visit Employee Health and the
subsequent requirement that she be cleared by Dr. Cunninghan were job-related and

consistent with business necessity and do not suggest that LVH regarded her as disabled under the ADA.  See Tice 247 F.3d at 515-16.

Having carefully considered the evidence, I find that Furry has failed to demonstrate she is disabled under the ADA.  Accordingly, summary judgment will be entered in favor of LVH on Counts I and III.

### B.      FMLA Claim (Count II)

The parties filed cross motions for summary judgment on Count II's FMLA claim. Defendants argued Furry's FMLA claim is time barred under the governing two-year statute of limitations.  As Furry's Brief in Opposition correctly observes, the FMLA claim is timely in light of Rule 6 of the Federal Rules of Civil Procedure.  In their Reply, Defendants withdrew their summary judgment argument that the FMLA claim is time barred.  Because Furry does not oppose the dismissal of Defendants Brunkovsky and Hoover, those individual defendants are dismissed.  Therefore, all that remains is Furry's motion for summary judgment against LVH and Kresge ("LVH Defendants") on Count II.

Furry asserts a claim for interference under the FMLA.   Under the FMLA, "it shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1).  To prevail on an interference claim, a plaintiff must show (1) he was an eligible employee under the FMLA, (2) defendant was an employer subject to the requirements of the FMLA, (3) he was entitled to leave under the FMLA, (4) he gave notice to the defendant of his intention to take FMLA leave, and (5) the defendant was

denied benefits to which he was entitled under the FMLA.  Lombardo v. Air Products & Chemicals, Inc., CIVA 05-1120, 2006 WL 1892677, at *3 (E.D. Pa. July 7, 2006).

      Furry's motion for summary judgment must be denied because a genuine issue of material fact exists regarding whether she provided LVH with adequate notice of her intention to take FMLA leave.  Whether an employee's notice was adequate is generally a question of fact.  Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 11-3419, 2012 WL 3140350, at *7 (3d Cir. Aug. 3, 2012).  Furry contends in her Second Amended Complaint that she requested FMLA leave in April 2008 due to her miscarriage.  In her deposition, however, she repeatedly denied that she ever requested FMLA leave for her miscarriage.  (Furry Dep. at 83, 105-06, 244, 287-89, 305-06.)  At one point, she expressly repudiated the allegations in her complaint:

> Q:    Your complaint in paragraph 21 before you says, quote, In April 2008, plaintiff, that's you, requested FMLA leave supported by your obstetrician because of a miscarriage.
>
> A.    My obstetrician never wanted me out of work, so I – this isn't accurate.
>
> Q:    Do you know why there is an inaccurate allegation in your complaint?
>
> A:    No, I don't.

(Furry Dep. at 134-35.)  Furthermore, Furry successfully requested FMLA leave twice before and admitted that she knew how to obtain FMLA leave documents.  (Id. at 305-06.)  This is not to say that Furry's request for time off without mentioning the FMLA was necessarily insufficient to constitute adequate notice, see Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 402 (3d Cir. 2007), only that this determination is

properly left to a jury.  Plaintiff's motion for summary judgment on Count II is therefore denied.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment as to Counts I and III is granted, Defendants' motion as to Count II is granted in part and denied in part, and Plaintiff's motion for partial summary judgment is denied.

An appropriate Order follows.